**2019 BNH 001**    Note:   This is an unreported opinion.  Refer to LBR 1050-1 regarding citation.
_____

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| In re: | Bk. No. 17-11529-BAH |
| | Chapter 7 |
| Mark S. Rissala, | |
|       Debtor | |
| | |
| Mark S. Rissala, | |
|       Plaintiff | |
| | |
| v. | Adv. No. 18-1017-BAH |
| | |
| New Hampshire Higher Education Assistance Foundation, | |
|       Defendant | |

*Michael C. Shklar, Esq.*
*Elliott Jasper Auten Shklar & Ranson, LLP*
*Attorney for Plaintiff*

*Clifford Gallant, Jr., Esq.*
*Beliveau, Fradette & Gallant, P.A.*
*Attorney for Defendant*

## MEMORANDUM OPINION

**I.  INTRODUCTION**

     Mark S. Rissala (the "Debtor") filed a complaint seeking to except his student loan debt from discharge pursuant to 11 U.S.C. § 523(a)(8) as he contends repaying the debt would impose an undue hardship on him.  New Hampshire Higher Education Assistance Foundation ("NHHEAF"), the current holder of the Debtor's student loan debt, disagrees.  The Court conducted a trial of this matter on December 18, 2018, and took the matter under advisement.

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and Local Rule 77.4(a) of the United States District Court for the District of New Hampshire.  This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II.  FACTS

The Debtor was born in 1957.  He obtained an associate's degree from New Hampshire Technical Institute in 1993, and a bachelor's degree from Springfield College in 1995, with both undergraduate degrees relating to human services.  The Debtor also attended graduate school at Antioch University New England in Keene, New Hampshire, in order to obtain a master's degree (also relating to human services).  Between September 1, 1997, and September 1, 1998, the Debtor obtained a series of federal student loans, both subsidized and unsubsidized, for the purpose of funding his graduate education.  On October 11, 1999, the Debtor consolidated his student loans into one loan comprised of two component parts, one subsidized and the other unsubsidized.  After consolidation, the principal loan balance approached $50,000.00.

The Debtor made consistent payments on both portions of his loan on a regular basis between the inception of the consolidated loan in October 1999 and March 2016; he also applied for and received several forbearances.  During this period, the Debtor was employed by the State of New Hampshire, Department of Health & Human Services, Division of Children, Youth and Families ("DCYF") on a full-time basis as a child protection social worker and as a child protection supervisor, positions that he held for the majority of his eighteen-year career with DCYF.

The Debtor filed a voluntary chapter 7 bankruptcy petition on October 31, 2017.  As of the date of his bankruptcy filing, the principal balance and accrued interest due on the consolidated student loan was as follows:

| Principal Balance | $49,678.45 |
|---|---|
| Accrued Interest | $0.00 |
| Per Diem | $9.86088 |

The payment terms on the consolidated note as of the petition date (e.g., the interest rate, the monthly payment amount, and the number of monthly payments left) were as follows:

| Interest Rate | 7.250% Fixed |
|---|---|
| Monthly Payment Amount | $505.49 |
| Monthly Payments Left | 136 months |

According to Schedule I to the Debtor's bankruptcy petition, as of the date of his bankruptcy filing, the Debtor's gross monthly income was $5,575.40[1] from his employment with DCYF and his net monthly income was $3,799.59, after deductions for taxes, mandatory retirement contributions, insurance, and union dues.[2] According to Schedule J to the Debtor's petition, as of the date of his bankruptcy filing, his monthly expenses totaled $3,657.16, not including the $505.49 monthly student loan payment.

The Debtor retired from DCYF postpetition, effective December 1, 2017, at the age of sixty. The Debtor currently receives a pension benefit from DCYF in the amount of $1,298.67 per month, which monthly benefit will continue until he reaches age sixty-five. Upon reaching age sixty-five, the Debtor's retirement benefit will be reduced to $1,162.63, which benefit amount will continue for the balance of his life.[3]

---

[1] The Court notes that this is somewhat higher than the income he reported on his 2016 federal income tax return ($59,932.00/12 or $4,994.33/mo.) and his 2017 federal income tax return ($60,061.00/12 or $5,005.08/mo.). The difference was not explained at trial.

[2] The Debtor's schedules do not reflect the income of his wife. The parties agree that, since May 1, 2016, the Debtor and his now wife, Palma Rissala ("Ms. Rissala" or the "Debtor's wife"), have shared living expenses. The Debtor's wife testified that the couple married prepetition on June 29, 2017. The Debtor has no dependents.

[3] This reduction is presumably based upon the fact that the Debtor will begin collecting Social Security retirement benefits at some point.

As of December 9, 2017, the Debtor's projected retirement Social Security benefit was as follows:

At his current earnings rate if he continued working until…
- age 62, his payment would be about $1,288 a month
- full retirement age (66 and 6 months), his payment would be about $1,918 a month
- age 70, his payment would be about $2,547 a month

Because the Debtor stopped working at age sixty, presumably the amount he will collect in Social Security benefits will be less than the amounts provided in his 2017 Social Security statement.

The Debtor's wife collects Social Security disability benefits in the amount of $1,701.00 per month. Thus, together the couple's current gross monthly income is $2,999.67 ($1,701.00 plus $1,298.67). Their net monthly income is closer to $2,670.00, after the couple's insurance expenses are deducted. Ms. Rissala did receive as much as $750.00 per month in income in 2018 from providing companionship services to a terminally ill gentleman; however, that individual passed away in September and she has not found similar employment since. Ms. Rissala has medical issues of her own that prevent her from undertaking typical employment. She testified that the Social Security Administration has found her permanently and totally disabled.

The Debtor does not suffer from any major medical issues which prevent him from obtaining employment. He testified that he does have some shoulder issues—he had surgery in early 2018 on his right shoulder and experiences pain his left shoulder caused by bursitis and fraying tendons—and he has experienced memory loss issues, which he had attributed to the stress of his job at DCYF and which have not subsided since his retirement. The Debtor testified that he has been looking for employment since even before he retired from DCYF in December 2017. He has applied for approximately thirty jobs, receiving only two interviews to date, one of which was scheduled for the day after the dischargeability trial. The Debtor testified that the

position was as a counselor at a residential home for boys, a job for which the Debtor seems well suited given his experience at DCYF.  The Debtor indicated that he had no idea what the pay would be for this job if he were to be offered it.  Besides seeking employment, the Debtor's daily retirement activities consist of resting at home, reading, watching television, visiting with his children and grandchildren, occasionally going out for dinner, cleaning, and home maintenance.

The Debtor's documented expenses (as evidenced by his bank statements) totaled $2,724.30 for April 2018 and $3,032.30 for May 2018, not including the $505.49 student loan payment.  Comparing the Debtor's net income as of the date of trial with these monthly expenses, it is clear the Debtor does not have any disposable income.  He testified that non-routine expenses cause him and his wife financial problems.  He indicated that the couple shares one car, a 2016 Honda CRV.  They recently had to replace its brakes, which cost $260.00.  This unexpected expense caused them to miss their December lease payment for the vehicle in the amount of $316.31.  He testified further that the lease is terminating in May 2019.  He does not think they will qualify for a loan or lease at that time.  As further evidence of their financial difficulties, he stated that he and his wife have gone to a food pantry for food and have had to ask for money from his mother to pay for prescriptions.

In September 2018, the Debtor submitted an "Income-Driven Repayment (IDR) Plan Request" to the United States Department of Education.  He was informed that under the Income-Based Repayment (IBR) Plan his monthly student loan payment would be reduced to $0.00 based on his current income.  Under the IBR Plan, the Debtor's income would be re-evaluated every year resulting in a new determination as to his required monthly student loan payment.  If he were to remain on the IBR Plan for twenty-five years, his student loan balance would then be cancelled or forgiven by the government.

### III.  DISCUSSION

Debtors cannot discharge educational loans "unless excepting such debt from discharge … would impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8); see Bronsdon v. Educ. Credit Mgmt. Corp. (In re Bronsdon), 435 B.R. 791, 796 (B.A.P. 1st Cir. 2010).  "The creditor bears the initial burden of establishing that the debt is of the type excepted from discharge under § 523(a)(8).  Once that showing is made, the burden shifts to the debtor to prove that excepting the student loan debt from discharge will cause the debtor and her dependents 'undue hardship.'"  Bronsdon, 435 B.R. at 796 (citing Smith v. Educ. Credit Mgmt. Corp. (In re Smith), 328 B.R. 605 (B.A.P. 1st Cir. 2005); Educ. Credit Mgmt. Corp. v. Savage (In re Savage), 311 B.R. 835 (B.A.P. 1st Cir. 2004)).

NHHEAF has met its initial burden outlined above as the Debtor does not dispute the existence of the debt or that the loan is of the type described in § 523(a)(8).[4]  Thus, the Debtor must establish by a preponderance of the evidence that paying his student loan will cause him undue hardship.  See Grogan v. Garner, 498 U.S. 279, 287 (1991).  To prove undue hardship, the Debtor must satisfy a "totality of the circumstances" test.  Blanchard v. New Hampshire Higher Educ. Assistance Found. (In re Blanchard), 2014 BNH 008, 15.  As explained by the Bankruptcy Appellate Panel for the First Circuit:

> The totality of the circumstances analysis requires a debtor to prove by a preponderance of evidence that (1) his past, present, and reasonably reliable future financial resources; (2) his and his dependents' reasonably necessary living expenses; and (3) other relevant facts or circumstances unique to the case, prevent him from paying the student loans in question while still maintaining a minimal standard of living, even when aided by a discharge of other prepetition debts.  Courts should consider all relevant evidence—the

---

[4] Section 523(a)(8) applies to "an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or an obligation to repay funds received as an educational benefit, scholarship or stipend; or any other education loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual." 11 U.S.C. § 523(a)(8)(A)(i), (A)(ii), and (B).

> debtor's income and expenses, the debtor's health, age, education, number of dependents and other personal or family circumstances, the amount of the monthly payment required, the impact of the general discharge under chapter 7 and the debtor's ability to find a higher-paying job, move or cut living expenses.
> . . .
> The totality test looks to past, present, and future financial resources and necessary living expenses and whether, taken together with other factors, the debtor has the ability to repay while maintaining a minimal standard of living.

Bronsdon, 435 B.R. at 798 (citations and quotations omitted) (quoted in Blanchard, 2014 BNH 008, 14).

> "[D]istilled to its essence, the finding of undue hardship under § 523(a)(8) following the totality of the circumstances test rests on one basic question: 'Can the debtor now, and in the foreseeable near future, maintain a reasonable, minimal standard of living for the debtor and the debtor's dependents and still afford to make payments on the debtor's student loans?'" Bronsdon, 435 B.R. at 800 (quoting Hicks v. Educ. Credit Mgmt. Corp. (In re Hicks), 331 B.R. 18, 31 (Bankr. D. Mass. 2005)).  Whether a debtor has made a good faith effort to repay his or her student loans is also "a relevant factor in a totality of the circumstances inquiry." Blanchard, 2014 BNH 008, 15.  While courts measure undue hardship "as of the trial date," it is "a forward-looking concept." Bronsdon, 435 B.R. at 800 (citing Kelly, 312 B.R. at 204; Kopf v. United States Dep't of Educ. (In re Kopf), 245 B.R. 731, 744 (Bankr. D. Me. 2000)).

Abdinoor v. Navient Sols., Inc. (In re Abdinoor), 2015 BNH 006, 11.

### A. Past, Present, and Reasonably Reliable Future Resources

At the time he filed his bankruptcy petition on October 31, 2017, the Debtor's gross monthly income from his employment at DCYF was $5,575.40, and his net monthly income was $3,799.59.  Shortly after his bankruptcy filing, the Debtor retired from his job, which drastically reduced his income to $1,298.67 per month in retirement benefits, which will continue until he reaches age sixty-five.  Upon reaching age sixty-five, the Debtor's monthly retirement benefit will be reduced to $1,162.63, which benefit amount will continue for the balance of his life.

The Debtor's wife collects Social Security disability benefits in the amount of $1,701.00 per month.  Thus, at the time of trial, the couple's gross monthly income was $2,999.67

7

($1,701.00 plus $1,298.67). Their net monthly income was closer to $2,670.00, after the couple's insurance expenses were deducted.

The Debtor can expect to collect Social Security retirement benefits at some point. The Debtor testified that he was unsure when he would begin collecting that benefit, but that it would likely be at age sixty-two if he did not obtain employment before then. Given the Debtor's meager income, it seems reasonable to assume that he will begin collecting at age sixty-two. The amount he will collect is unknown, but it appears to the Court that is it likely to be less than $1,288.00 per month, as that was his estimated monthly benefit if he had continued working until age sixty-two, which he did not do. While the Debtor indicated he is actively seeking employment, and in fact had an interview scheduled for the day after trial for what sounded like a promising position, the Debtor did not have a job as of the date of trial. In the Court's view, his prospects for obtaining employment and thus a steady increase in income over time are speculative, given his age, and are therefore not promising. See Savage, 311 B.R. at 840.

It seems reasonable to conclude that beginning in December 2019, after the Debtor has reached the age of sixty-two, his gross monthly income will increase by approximately $1,200.00 to approximately $2,500.00. This amount will decrease once the Debtor reaches age sixty-five in November 2022 to approximately $2,360.00. There was no evidence presented that would suggest that the Debtor's wife can expect an increase in income in the foreseeable future given her health issues. Thus, the couple's combined gross income as of the date of trial was $2,999.67. It can be expected to increase to approximately $4,200.00 when the Debtor reaches age sixty-two if the Debtor begins collecting Social Security retirement benefits at that age. It can be expected to decrease to approximately $4,060.00 when the Debtor reaches age sixty-five due to the reduction in his DCYF retirement benefit that occurs at that age.

### B. Reasonably Necessary Living Expenses

Under the totality of the circumstances test, "a debtor must show that [his] necessary and reasonable expenses leave [him] with too little to afford repayment." Savage, 311 B.R. at 840. Necessary living expenses are those that a debtor "could not cut from the budget and still maintain a minimal standard of living." Id. at 841.

At the time he filed bankruptcy, the Debtor's monthly expenses totaled $3,657.16, not including the $505.49 monthly student loan payment. After his retirement, the Debtor reduced his expenses. The Debtor's documented expenses totaled $2,724.30 for April 2018 and $3,032.30 for May 2018, again not including the $505.49 student loan payment. NHHEAF did not challenge any of the Debtor's monthly expenses (which appear modest to the Court) as being unnecessary or unreasonable.[5] No evidence was presented to show that the Debtor's expenses had changed as of the date of trial or that they would significantly change in the future.[6]

Comparing the Debtor's net income as of the date of trial with these monthly expenses, it is clear the Debtor does not currently have any disposable income with which he could make his student loan payment. However, comparing the Debtor's expected increase in income commencing at the end of 2019, the Debtor would have disposable income at that time with which he could make his student loan payment. The Debtor's and his wife's gross monthly income would be $4,200.00 per month; reducing this amount by the Debtor's and his wife's

---

[5] For example, the Debtor's monthly rent expense averaged $1,400.00, his monthly food expense averaged $191.14, his monthly gasoline expense averaged $63.91, and his monthly clothing expense averaged $74.93.

[6] While the Debtor did testify that he would need to secure a different vehicle in May 2019, no evidence was presented to suggest that the monthly lease or loan payment would be significantly different from the current payment. The Debtor's wife testified that she needed to obtain additional health insurance, but she was unsure what the additional amount would be, and indicated it may be as low as $50.00 per month if she were eligible to go on the Debtor's insurance.

9

monthly insurance expenses of approximately $330.00, the couple's net monthly income would be $3,870.00.  This amount would be sufficient to pay the Debtor's average monthly expenses of $2,880.00, and would leave him $990.00 per month from which he could make his $505.49 student loan payment.  After making that payment, the Debtor and his wife would still have approximately $485.00 in surplus income each month (annualized to $5,820.00).  See Abdinoor, 2015 BNH 006, 14 ("As other bankruptcy courts in the First Circuit have held, a debtor cannot establish undue hardship while carrying a monthly surplus or otherwise retaining funds that could be used to pay her student loan debt.") (citations omitted).  Even with the anticipated reduction in income once the Debtor reaches age sixty-five, the Debtor's and his wife's net monthly income would be approximately $3,730.00 from which he could pay both his average monthly expenses of $2,880.00 and his student loan payment of $505.49.  He would still be left with a surplus of approximately $345.00 each month (annualized to $4,140.00).  Thus, the Debtor has not shown that, once he gets over the hurdle of the next ten or eleven months, his necessary and reasonable expenses will leave him with too little to afford repayment of his student loan.

    C.  **Other Unique Facts or Circumstances**

"The third factor under the totality of the circumstances test is whether there are other relevant facts or circumstances 'unique to the case' that would prevent a debtor from maintaining a minimal standard of living."  Abdinoor, 2015 BNH 006, 14.  The Debtor has not presented any unique facts or circumstances to suggest that he would not able to maintain a minimal standard of living if he were required to repay his student loan.  NHHEAF has presented evidence that the Debtor is eligible to participate in an IDR Plan.  The Court notes that a debtor's eligibility to participate in an income-driven repayment plan may be considered by bankruptcy courts when applying the totality of the circumstances test; however, such eligibility is not determinative and

does not mandate a particular outcome in the undue hardship analysis.  See Bronsdon, 435 B.R. at 801, 804.

Here, the Debtor is eligible to participate in the IBR Plan, which would require the Debtor to pay 15% of his discretionary income, i.e., 15% of the amount by which his adjusted gross income exceeds 150% of the poverty guideline amount.  The Debtor would need to submit his financial information each year in order for the government to analyze his ability to pay and to re-calculate the required student loan payment for the next year.  When the Debtor applied for an IDR Plan in September 2018, he was informed that his monthly payment would be $0.00.  Given that the Debtor would not be required to make any payments on his student loan for a year if he agreed to participate in the IBR Plan, and that his income after that year would be sufficient to both make the full monthly student loan payment and have a surplus each month, the Court finds that it would not be an undue hardship for the Debtor to repay his student loan.[7]

## IV.  CONCLUSION

The Debtor has not satisfied his burden of establishing that paying his student loan would constitute an undue hardship within the meaning of § 523(a)(8).  For that reason, the Court finds that the Debtor's student loan debt should not be excepted from discharge.  This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule

---

[7] The Court acknowledges that, when considering an IDR Plan as a factor under the totality of the circumstances test, courts "evaluate both the benefits and drawbacks of the programs for the individual debtor within his or her unique circumstances … [and that] such programs may be detrimental to the borrower's long-term financial health" where the Debtor may "simply exchange a nondischargeable student loan debt for a nondischargeable tax debt," when the IDR Plan calls for the forgiveness of any unpaid debt, as the IBR Plan does here.  Bronsdon, 435 B.R. at 802.  The Court notes that the Debtor did not argue this point at trial.  In addition, the Court is uncertain that the issue of forgiveness of debt will ever be reached in this case.

of Bankruptcy Procedure 7052.  The Court will issue a separate judgment consistent with this opinion.

    ENTERED at Concord, New Hampshire.

Date:   January 11, 2019                                  <u>/s/ Bruce A. Harwood</u>
                                                            Bruce A. Harwood
                                                            Chief Bankruptcy Judge